UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ NOV 0 4 2009

P.M.
TIME A.M.

-------------------------------------------------------------x
BOB MEADOWS,

                              Plaintiff,                          MEMORANDUM and ORDER

         -against-                                               08-CV-2846 (SLT)(ALC)

PLANET AID, INC., *et al.*
                              Defendants.
-------------------------------------------------------------x

TOWNES, United States District Judge:[1]

         Pro se plaintiff, Bob Meadows ("Plaintiff"), a former employee of Planet Aid, Inc.

("Planet Aid"), supervised by Rodney Carter ("Carter") and Jostein Pedersen ("Pederson")

(collectively, with Planet Aid, the "Defendants"), brings this action pursuant to 28 U.S.C.

§ 1331, alleging, *inter alia*, age and race discrimination, violations of the Fair Labor Standards

Act ("FLSA") and the New York State Human Rights Law ("NYSHRL"). Defendants now

move to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below,

Defendants' motions are granted in part and denied in part.

## *BACKGROUND*

         The following facts are drawn from Plaintiff's amended complaint, the truth of which is

assumed for purposes of this motion to dismiss. Due to the nature of Plaintiff's claims, this

Court must set forth in great detail the facts alleged by Plaintiff.

         Plaintiff, a former trucker, is a 64-year-old male of African-American and Native-

American descent. Amended Complaint at 2. On or about Saturday, June 9, 2007, Plaintiff

---

[1]The Court gratefully acknowledges the assistance of J. Ricciardiello in the preparation of
this Memorandum and Order.



responded to a job opening posted by Planet Aid--a non-profit organization which collects and recycles used clothing and shoes in 19 states--at the Brooklyn Chamber of Commerce. *Id.* at 5 and 8. Planet Aid was seeking a "driver/bin maintenance person with a van," and the position paid $12 per hour, or approximately $25,000 per year. *Id.*

Carter, a manager at Planet Aid, conducted an in-person interview with Plaintiff at Planet Aid's Brooklyn headquarters on or about Thursday, June 21, 2007, and took a copy of Plaintiff's driver's license. *Id.* at 10. Carter informed Plaintiff that his job duties included keeping donation bins clean, washing bins, removing graffiti if possible and sweeping around the bins, disposing of garbage on or around bins, removing donation overflows and bringing them back to the Brooklyn headquarters, conversing with property owners where the bins were located and maintaining a daily log regarding bin condition. *Id.* at 11. Carter stated that payday was every Thursday and that turning the log in every Monday was a requirement for being paid. *Id.* Carter also informed Plaintiff that he would be provided with cleaning solution and a cell phone, and that he would be compensated for vehicle usage expenses such as gas and insurance. *Id.* Toll expenses were not discussed. *Id.*

Plaintiff informed Carter during this meeting that he owned a van, as the job posting required, but that it was not "on-the-road." *Id.* at 10-11. Plaintiff informed Carter that to ready the vehicle for work and to procure commercial insurance would cost Plaintiff approximately $4,000 and that he did not want to ready the vehicle unless he was sure that he had the position. *Id.* Carter replied that he would inform Plaintiff shortly as to whether he had the position. *Id.* at 11.

Plaintiff called Carter on or about Tuesday, June 26, 2007, and Carter told Plaintiff that

2

he "got the job" and should "go ahead put the van on the road." *Id.* at 13. At some point prior to Plaintiff preparing his vehicle for work, "Plaintiff clearly expressed to defendant that he was in sincere need of a long-term job and would not and could not afford to borrow money 'to put his van on the road' if defendant was not sincere in his long-term job offer." *Id.* at 49.

Plaintiff reported for work on Thursday, June 28, 2007, at which time Carter instructed Plaintiff to place Planet Aid identification stickers on donation bins, and then collect clothing from three addresses and return the clothing to the Brooklyn headquarters. *Id.* at 14. Although collecting clothing was not among the duties discussed at the job interview, Carter explained that it was part of a newly instituted "call pick-up program" and Plaintiff did not protest. *Id.* Aside from the Planet Aid identification stickers providing Planet Aid's telephone number, Plaintiff received no employee identification. *Id.*

After two uneventful pick-up calls in the morning, Plaintiff was sent to collect an evicted family's belongings from their third-story, walk-up apartment. *Id.* at 23. Their belongings consisted of "about a literal ton" of unclean clothing, household items and "everything else there was, except for furnishings." *Id.* Plaintiff alleged that Defendants did not supply him "with protective gear such as gloves, masks, nor did Defendant mention that such items would be necessary" when handling the unclean clothing. *Id.* at 16. Plaintiff cleared the evicted family's apartment for approximately four hours on Thursday, June 28, 2007, and for approximately four hours on Friday, June 29, 2007. *Id.* Plaintiff alleges that this pick-up emotionally distressed him, as it went against his "lifelong principles and ethics" to remove the property of individuals who had "not given consent for their belongings to be touched, removed or given away." *Id.*

On Friday, June 29, 2007, Plaintiff was directed to pick-up another donation at a private

3

residence in Staten Island. Plaintiff idled his vehicle outside the donor's house for one-and-a-half hours before the donor appeared. Although informed by Carter that the donor was on his way home, Plaintiff--who had heard news reports of violence against African-Americans occurring on Staten Island--was uncomfortable idling outside the residence without Planet Aid employee identification. *Id.* at 17-18. After the donor arrived, Plaintiff spent two non-consecutive days removing the approximately two tons of clothing, household appliances, and kitchen items. *Id.* at 18.

On or about Friday, June 29, 2007 Carter asked Plaintiff if he wanted to work on Saturdays. *Id.* at 19. Plaintiff replied in the affirmative and worked from 8:30 a.m. to 3:00 p.m. driving a 24-foot-long box truck around Brooklyn, placing clothing collection bins at appointed locations. *Id.* at 19-20. That same day, Carter instructed Plaintiff that he was to travel to New Jersey on Monday, July 2, 2007, to meet his boss, defendant Pederson, at the New Jersey headquarters. *Id.* at 19.

On Monday, July 2, 2007, Plaintiff, Carter and Pederson met in a New Jersey warehouse, where they discussed Plaintiff's position. *Id.* at 20. Pederson verbally approved Plaintiff's $12 per hour salary, but stated that "he would not pay for anyone's [automobile] insurance." *Id.* After the meeting, Carter and Plaintiff returned to Brooklyn headquarters, at which time Carter drafted an employment agreement which contained more job duties than had been posted in the original job listing or had been verbally described to Plaintiff at the job interview. *Id.* at 21. The employment agreement listed Plaintiff's additional job duties as: (1) hauling overflow clothing to the New Jersey headquarters, and (2) call pick-up person, which included handling, packing, and loading clothing. *Id.* at 23. The agreement also provided that Plaintiff would be reimbursed at

4

$.30 per mile for vehicle usage and would be provided with a GPS device, an E-Z Pass and a cell phone. *Id.* In Plaintiff's opinion, the expansion of his driver/bin maintenance position to include the "handling, packaging, hauling and delivery of clothing" created a "hostile work environment" because "the undue burdens and excess job responsibilities heaped on plaintiff" made Plaintiff fear for his "rightful bin maintenance position with Planet Aid" if he did not perform the additional duties well. *Id.* at 42.

On or about Tuesday, July 3, 2007, Carter requested that Plaintiff purchase work supplies from Home Depot, which Plaintiff did. *Id.* at 24-25. That day, Carter asked Plaintiff to use his personal cell phone for work, telling Plaintiff that he would be reimbursed. *Id.* at 26. Carter did not mention the procurement of an E-Z Pass for Plaintiff or reimbursements for tolls. *Id.* Carter also authorized Plaintiff to work the next day, Independence Day, so that Plaintiff would receive a full week's pay, but he warned Plaintiff not to "expect overtime pay." *Id.* Plaintiff worked Wednesday, July 4, 2007, placing Planet Aid stickers on collection bins. *Id.* at 27.

On Friday, July 6, 2007, Carter asked Plaintiff if he wanted to work on Saturday, July 7, 2007, at the New Jersey location. *Id.* at 27. Plaintiff agreed and arrived at the New Jersey warehouse at 6:00 a.m. on Saturday. *Id.* Although Plaintiff waited one hour, Carter never appeared. *Id.* On Monday, July 9, 2007, Carter explained that his absence on Saturday was due to out-of-state travel and that he had left his cell phone at the office. *Id.* Carter subsequently spread Plaintiff's Independence Day and Saturday hours throughout the regular work week, telling plaintiff, "Don't worry you're going to get paid." *Id.*

On or about Tuesday, July 17, 2007, Carter provided Plaintiff with a one-page memo of company rules. *Id.* at 29. That day, Carter asked Plaintiff for additional copies of his bin reports

5

because "they were nice and neat" and he wanted to show them to New York City Council to prove Planet Aid's compliance with city ordinances. *Id.* Carter also requested that Plaintiff assist in evaluating the purchase of a van for Planet Aid. *Id.* at 29. He informed Plaintiff that he wanted to replace Planet Aid's current truck driver--the only other African-American employed by Planet Aid besides Plaintiff--and asked if Plaintiff was interested. *Id.* at 29, 45. Plaintiff stated he wanted to keep his bin maintenance position, to which Carter replied, "I will place you where I want to place you!" *Id.* at 29, 45. Carter also stated that he found "communication issues" to be an "excellent means of terminating past employees." *Id.* at 34. Later that afternoon, Plaintiff picked up donations after completing a 55-mile route of bin-maintenance work, and dropped the donations off at Planet Aid's New Jersey Warehouse. *Id.* at 30.

At some point on Tuesday, July 17, 2007, Carter asked Plaintiff his age. After Plaintiff stated that he had just turned 63, Carter seemed surprised, then exclaimed, "Man, you are old enough to be my father! You're up there with Jostein Pedersen!" *Id.* at 24. Carter told Plaintiff that, although he had a copy of Plaintiff's driver's license, he had never looked at it. *Id.* Carter had once previously asked Plaintiff his age, on or about Tuesday, July 3, 2007, but Plaintiff ignored the question at that time. *Id.* at 23.

On Wednesday, July 18, 2007, Plaintiff began work in the morning amidst road-flooding conditions, arriving to his first clothing pick-up on Staten Island at 7:30 a.m. *Id.* at 30. He made a second collection that morning before driving the donations to New Jersey, arriving at noon. *Id.* There, he was given a large truck to pick-up a basement full of donations in Brooklyn. *Id.* After loading the truck, Plaintiff returned to the New Jersey warehouse by 7:30 p.m. *Id.* at 31. Plaintiff then exchanged the truck for his own vehicle and returned to Brooklyn. *Id.* Plaintiff

6

considered the return drive to Brooklyn to be "on-the-clock." *Id.*

On Friday, July 20, 2007, Plaintiff performed his bin-maintenance duties from approximately 5:00 a.m. through 3:00 p.m. *Id.* During that time, Plaintiff attempted to make contact with Carter to discuss a pick-up scheduled for Saturday, July 21, 2007. *Id.* On Saturday, July 21, 2007, Plaintiff called Carter regarding the pick-up and went to Planet Aid's Brooklyn headquarters and waited until noon, but Carter did not come to the office or respond to Plaintiff's calls. *Id.* On Monday, July 23, 2007, Carter explained his failure to return Plaintiff's calls to his cell phone by saying that his cell phone was "dead" and that he needed to "secure a cell phone battery." *Id.* at 32. At some point during that day, Plaintiff discovered a "disfiguring rash" on his legs and back. *Id.*

On Tuesday, July 24, 2007, Plaintiff gave Carter a letter. *Id.* In it, Plaintiff stated "I am interested only in the job for which I originally applied for and have ... as a maintenance person for Planet Aid - cleaning and maintaining the bins and removing minor overflows of clothing." Amended Complaint Exhibit K. Plaintiff declined any other position, stating, "Please know I am not interested in ... a regular position as a driver of the large truck whose duties are to pick-up and deliver clothing bins and remove tons of clothing from sites; or a manager position, whose duties are to oversee independent Planet Aid truck drivers. I will only accept such work ... when I am able, on Saturdays, and only if I receive the fair and proper wage of time and a half." *Id.* In this letter, Plaintiff also alleges that he had "not received time and a half payment for ... Saturday work" and instead only received the regular wage. *Id.*

After reading Plaintiff's letter, Carter told Plaintiff that he was "right" and stated "We will speak on this. You had help writing this letter!" Amended Complaint at 33. That same day,

Plaintiff and Carter drove to examine a van, but the van did not start even after several battery changes. *Id.* Carter decided to purchase the van nonetheless and called Pederson, telling him the van cost $2,000 when it actually cost $1,800. *Id.* Plaintiff then told Carter that, if Pederson asked him, he would have to tell him that "I did not hear the van start up." *Id.* at 34. However, there is no allegation that Carter ever asked Plaintiff to tell Pederson the van started when it did not or that Plaintiff ever told Pederson of Carter's actions.

On Thursday, July 26, 2007, Plaintiff arrived at Brooklyn headquarters to get his paycheck. *Id.* at 33. His paycheck was not available, there were no pick-up calls scheduled for him, and Carter was not there. *Id.* Plaintiff waited for Carter for one hour before leaving to work on the "tour sheet" left over from the previous week, as he had done the day before. *Id.* On Friday, July 27, 2007, Plaintiff called Planet Aid's Brooklyn headquarters to inquire about his paycheck and to get information about a pick-up Carter had scheduled for Saturday, July 28, 2007, but there was no information. *Id.* at 34. Plaintiff spent an hour trying to contact Carter that day, but was unable to reach him. *Id.* On Saturday, July 28, 2007, Plaintiff still did not have the information to do that day's pick-up, so he went to Planet Aid's Brooklyn headquarters at 9:00 a.m. and waited until noon for Carter. *Id.* Although he also called Carter's cell phone, Plaintiff was not able to make contact with Carter. *Id.*

At some point on Monday, July 30, 2007, Carter and Plaintiff met at Planet Aid's Brooklyn headquarters. *Id.* at 35. Carter gave Plaintiff a document entitled "Summary Report" which Carter then instructed Plaintiff to read. *Id.* Carter insisted the document was not disciplinary, "just a summary." *Id.* The document, which was dated July 27, 2007, stated that Plaintiff would be terminated on August 3, 2007, because he refused to accept another position at

8

Planet Aid, and because Plaintiff had issues with "communication," "unauthorized work," and "timely time sheets." *Id.* at 35-36. Carter then stated he had not heard from Plaintiff on July 26th and July 27th. *Id.* at 36. The dismissal, Carter insisted, was not an "official dismissal;" he was simply giving away Plaintiff's job. *Id.*

On Thursday, August 2, 2007, Plaintiff went to Planet Aid to retrieve his paycheck, but no paycheck was available. *Id.* On Monday, August 6, 2007, Plaintiff arrived at Planet Aid in the early morning. *Id.* at 37. Carter was not there, but Plaintiff's paycheck envelope was there and contained a termination letter. *Id.* The letter stated that Plaintiff had "unsatisfactory job performance" and "communication" problems, and raised issues of "unauthorized work" and "abuse of overtime." *Id.* Plaintiff asserts that he never worked any unauthorized bin/site maintenance time and that any overtime attributable to his residential or business donation pick-ups was both authorized and assigned by Carter. *Id.* at 38.

Post-termination, on Thursday, August 9, 2007, Plaintiff went to Planet Aid's Brooklyn headquarters to receive his last paycheck but it was not available. *Id.* at 39. At some point, Carter faxed a message to Plaintiff directing him to return all company property and to hand in receipts. *Id.* Plaintiff complied by returning cleaning products and receipts for gas and tolls. *Id.* Plaintiff returned to the Planet Aid headquarters on Monday, August 13, 2007, to pick-up his paycheck but the office appeared closed. *Id.* Plaintiff asserts he never received pay for his "final wages and expenses." *Id.* at 48. Plaintiff subsequently learned that he had been replaced by a friend of Carter's who appeared to be in his 30's. *Id.* at 3-4, 35 and 44.

On or about August 15, 2007, Plaintiff submitted a complaint to the New York State Division of Human Rights ("NYSDHR"), alleging a violation of the NYSHRL. *Id.* at 44.

9

Thereafter, Plaintiff "fell into a shocked and depressed state" from the loss of his job. *Id.* In January 2008, Plaintiff lost partial vision in one eye, which a specialist diagnosed as having occurred due to a stroke in his eye caused by hypertension/stress. *Id.* at 41. Treatment cost over $2,000 and Plaintiff was informed it was unlikely his eye "would ever be normal again." *Id.* In July 2008, Plaintiff was forced to repair his van's transmission because it had been damaged by the overloading done during Plaintiff's employment at Planet Aid. *Id.*

On July 8, 2008, Plaintiff commenced this action by filing a complaint, to which he attached an EEOC "right-to-sue" letter. Plaintiff amended his complaint on December 1, 2008, asserting claims for age and race discrimination, as well as violations of the NYSHRL, FLSA, breach of contract, unjust enrichment, intentional interference with an advantageous relationship, retaliation and whistleblower violations, hostile work environment, intentional and negligent infliction of emotional distress, defamation, and fraud and misrepresentation, among others.

Defendants now move to dismiss this complaint pursuant to Fed. R. Civ. P. 12(b)(6). The twelve arguments raised in Defendants' motion and Plaintiff's responses thereto are addressed in detail below.

## DISCUSSION

<u>Standard of Review</u>

In considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (*quoting Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 570 (2007)). Where a plaintiff proceeds *pro se*, the pleadings must be construed liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008); *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004). A "*pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). "This is particularly so when the *pro se* plaintiff alleges that her civil rights have been violated." *Sealed Plaintiff*, 537 F.3d at 191; *see McEachin*, 357 F.3d at 200. Accordingly, the "dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases." *Boykin v. KeyCorp*, 521 F.3d 202, 216 (2d Cir. 2008).

Because "a Rule 12(b)(6) motion challenges the facts alleged on the face of the complaint … or, more accurately, the sufficiency of the statements in the complaint," *see Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (internal citations omitted), only certain matters outside of the four corners of Plaintiff's pleading may be considered in assessing the complaint's sufficiency. As the Second Circuit has stated:

> When determining the sufficiency of plaintiff's claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiff's [pleading] … , to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in brining suit.

*Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citing *Cortec*, 949 F.2d at 47-48). If material other than that listed by the *Brass* Court "is presented to and not excluded by the court, 'the motion shall be treated as one for summary judgment and disposed of as provided in [Federal Rule of Civil Procedure] 56, and all parties shall be given reasonable

11

opportunity to present all material made pertinent to such a motion .... '" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting Fed. R. Civ. P. 12(b)).

Defendants' Arguments

Although Defendants style their motion as a motion to dismiss pursuant to Rule 12(b)(6), few of Defendants' arguments assert that the facts alleged by Plaintiff fail to make out a cause of action. Rather, many arguments raised in the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint ("Defendants' Memo") either assert that Plaintiff has failed to meet the notice pleading requirement of Rule 8(a) or contend that Plaintiff cannot prove his allegations.

For example, Plaintiff's first cause of action--entitled, "Plaintiff's age discrimination claim must fail"--contains the germ of three separate arguments. First, Defendants assert, "[u]pon information and belief," that Plaintiff has neither filed a charge with, nor obtained a right-to-sue letter from, the EEOC and, therefore, cannot satisfy "a statutory prerequisite for the filing of a federal age discrimination claim" in this Court. Defendants' Memo at 7-8. Second, Defendants list the elements of a prima facie case of age discrimination, and imply that Plaintiff must plead all four elements. *Id.* Third, Defendants argue that, "[e]ven assuming ... Plaintiff had complied with administrative prerequisites and pled all four elements, ... the Amended Complaint, on its face, does not set forth enough facts to rebut the legitimate non-discriminatory reasons for termination." *Id.* at 8.

The first of these arguments is based on mere speculation that Plaintiff may have failed to exhaust his administrative remedies prior to commencing this action. While Defendants are correct in noting that a plaintiff can bring an age discrimination claim in federal court only after

12

filing timely charges with the EEOC, *see McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 213-14 (2d Cir. 2006), Defendants do not explain why they believe that Plaintiff has not met this prerequisite. Indeed, a copy of an EEOC's right-to-sue letter, dated April 15, 2008, is attached to Plaintiff's original complaint, which was served on defendants Planet Aid and Carter in August 2008.

Defendants' second argument implies that Plaintiff has not satisfied Rule 8(a)'s notice pleading requirements because he has not specifically pled each element of an age discrimination claim. Until 2002, the Second Circuit employed a heightened pleading standard for employment discrimination cases, requiring that discrimination complaints allege specific facts sufficient to establish a prima facie case. *See, e.g., Tarshis v. Reise Org.*, 211 F.3d 30, 35 (2d Cir. 2000). However, in *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), the United States Supreme Court rejected the view that employment discrimination complaints require greater particularity, holding that such complaints--like most other civil complaints--need only comply with Federal Rule of Civil Procedure 8(a)'s simplified pleading requirements. *Id.* at 513. There is no question that Plaintiff's detailed, 51-page complaint more than satisfies Rule 8(a)'s requirements.

Defendants' third argument, which faults Plaintiff for failing to "set forth enough facts to rebut the legitimate, non-discriminatory reasons for termination," sounds in summary judgment. To be sure, this Court has discretion to convert a Rule 12(b)(6) motion into a motion for summary judgment, *see* Fed. R. Civ. P. 12(d). However, since Plaintiff is *pro se* and has not yet had an opportunity to conduct any discovery, it would not be appropriate to put Plaintiff to his proof at this juncture. Defendants may renew this argument in a motion for summary judgment after discovery has been completed.

Defendants' second point--entitled, "Plaintiff's race discrimination claim must fail"--is similar to the first point in arguing that Plaintiff has failed to plead essential elements of his race discrimination claim and has not adduced sufficient proof with respect to these elements. Specifically, Defendants argue that Plaintiff (1) "does not plead two essential elements for a race discrimination claim — satisfactory performance of his duties and circumstances giving rise to an inference of discrimination," (2) "does not demonstrate any circumstance that would provide any inference of discrimination," and (3) "makes no showing that he performed his duties satisfactorily to rebut Defendants' legitimate nondiscriminatory reasons for termination." Defendants' Memo at 9-10. As discussed above in connection with Defendants' first point, Plaintiff is not required to allege facts sufficient to establish each element of a prima facie case, *see Swierkiewicz*, 534 U.S. at 513, or to adduce any proof at this stage of the proceedings. Again, Defendants may renew this argument in a motion for summary judgment after discovery has been completed.

Defendants' third point, which seeks to dismiss Plaintiff's claims under the NYSHRL, specifically refers this Court to Defendants' first two points and states, "Plaintiff does not allege any different facts for his Human Rights Law claims other than the facts he alleges for his age and race discrimination claims." Defendants' Memo at 11. Although Defendants use the term, "allege," rather than "show" or "prove," this Court assumes that Defendants are making the same arguments raised above. As explained above, Defendants' first and second points lack merit.

There is another, more substantial argument implied in Defendants' third point, however. Defendants note that Plaintiff has filed a charge with the NYSDHR, and that "Plaintiff did not ... proceed in New York State Supreme Court" after this State agency dismissed Plaintiff's charge.

14

*Id.* While Defendants do not argue that the NYSDHR's determination has preclusive effect, they do "request that this court give strong deference to a state agency determination of state law issue." *Id.*

The NYSHRL provides, in relevant part, that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages ... and such other remedies as may be appropriate ... unless such person had filed a complaint hereunder or with any local commission on human rights. N.Y. Exec. Law § 297(9); *York v. Ass'n of Bar of City of New York*, 286 F.3d 122, 127 (2d Cir. 2001). This means that NYHRL claims, once brought before the NYSDHR, may not be brought again as a plenary action in another court. *York*, 286 F.3d at 127 (citing *Moodie v. Fed. Reserve Bank of New York*, 58 F.3d 879, 882 (2d Cir. 1995)). Moreover, NYSDHR determinations may only be appealed to New York State Supreme Court. *Id.* (citing N.Y. Exec. Law § 298). Because the NYSHRL deprives this Court of subject matter jurisdiction when an action has first been commenced with the NYSDHR, *see* N.Y. Exec. Law § 297(9); *Moodie*, 58 F.3d at 882, Plaintiff's NYSHRL claim must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

Defendants' fourth point--entitled, "Plaintiff's Fair Labor Standards Act claims must fail"-- is a true 12(b)(6) argument, asserting that the facts alleged by Plaintiff do not make out an FLSA violation. Defendants, ostensibly relying on *Zhong v. August August Corp.*, 498 F. Supp. 2d 625 (S.D.N.Y. 2007), argue that Plaintiff must establish "(1) an employee-employer relationship (2) employment which *requires* some kind of interstate activity (3) hours worked where wage was not received, and (4) facts that would entitled him to relief." Defendants' Memo at 11 (emphasis in original). Defendants argue that Plaintiff cannot make out the second

element because "Plaintiff alleges that he traveled to New Jersey on [only] one occasion, to meet Planet Aid's manager, Jostein Pederson." *Id.* at 12.

Defendants' argument with respect to the second element is without merit for two reasons. First, Defendants' paraphrasing of this element is inaccurate. The FLSA does not apply only to employees who are "engaged in interstate commerce," *Zhong*, 498 F. Supp. 2d at 628, and, contrary to Defendants' representations, the FLSA does not require that "interstate activity be a regular part of Plaintiff's work for federal law to apply." Defendants' Memo at 12. Indeed, *Zhong*, the case on which Defendants principally rely, itself holds that the FLSA applies to employees who are *either* "engaged in commerce or in the production of goods for commerce" or who are "employed in an *enterprise* engaged in commerce of in the production of goods for commerce." *Zhong*, 498 F. Supp. 2d at 629 (emphasis added) (citing FLSA §§ 206(a) and 207(a)(1)).

It is likely that defendant Planet Aid, with activities in more than 19 states, complies with the FLSA' definition of an "enterprise engaged in commerce." However, we need not examine the FLSA's definition of "enterprise" as it applies to Planet Aid, because Plaintiff's pleading repeatedly alleges that his own work involved interstate activity. Plaintiff alleges that he first traveled to New Jersey on Monday, July 2, 2007, where Plaintiff, Carter and Pederson met in a New Jersey warehouse to discuss Plaintiff's position. Amended Complaint at 20. Plaintiff again traveled to New Jersey on Saturday, July 7, 2007, to work overtime hours. *Id.* at 27. On Tuesday, July 17, 2007, Plaintiff traveled to New Jersey after completing a 55-mile route of bin-maintenance work in order to drop off donations at Planet Aid's New Jersey Warehouse. *Id.* at 30. Finally, on Wednesday, July 18, 2007, Plaintiff traveled to New Jersey at least two separate

16

times for work-related purposes. Thus, by Defendants' own test, Plaintiff has sufficiently pleaded "some kind of interstate activity."

Defendants also argue that the third element of an FLSA claim is not made out, asserting that the "the basis for Plaintiff's [FLSA claim] ... is that Carter informed him that employees get paid on Thursday, and not because Plaintiff was not paid for any hours worked." Defendant's Memo at 11. However, as Defendants' Memo itself acknowledges, Plaintiff also specifically alleges that he was not paid for his final week of work or expenses. *Id.* at 12 and Amended Complaint at 48. Defendants claim that these allegations are not factually supported but, as discussed above, Plaintiff need not prove his allegations at this stage of the proceeding. Again, Defendants may renew this argument in a motion for summary judgment after discovery has been completed.

Defendants' fifth point--entitled, "Plaintiff's breach of contract claim must fail"-- asserts that Plaintiff has not alleged facts sufficient to state a claim for breach of contract. Defendants state that there are three elements to such a claim: "(1) the existence of a contract (2) breach of that contract, and (3) damages resulting from the breach." Defendants' Memo at 12 (citing *Nat'l Market Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520, 525 (2d Cir. 2004)). Defendants concede that "Plaintiff alleges that a contract exists," but argue that he "does not demonstrate any material breach or damages." Defendants' Memo at 12-13. Defendants also fault Plaintiff for not alleging "the hours worked or the work performed." *Id.* However, Rule 8(a) does not require this level of specificity at the pleading stage, especially not for *pro se* plaintiffs, whose complaints "must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94 (2007). Accordingly, Defendants' motion as to the breach of contract

17

claim is denied.

In their sixth point--entitled "Plaintiff's unjust enrichment claim must fail"-- Defendants argue that Plaintiff has not alleged facts sufficient to state a claim for unjust enrichment. Defendants argue that "in order to establish a claim for unjust enrichment, Plaintiff must demonstrate (1) defendant benefitted (2) at Plaintiff's expense, and (3) equity and good conscience require restitution." Defendants' Memo at 14 (citing *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). Defendants claim that the only allegations in the Amended Complaint which arguably support Plaintiff's claim are the allegations relating to the $4,000 Plaintiff spent to put his van on the road.

There are, however, other allegations in the Amended Complaint which suggest unjust enrichment. For example, Plaintiff alleges he was not reimbursed for the use of his prepay cell phone, or for his tolls and gas expenses. Amended Complaint at 48-49. Therefore, even though the allegations relating to the $4,000 Plaintiff spent on his van may not support an unjust enrichment claim, there are other allegations which, if proven, would suffice to make out such a claim. Accordingly, Defendants' motion to dismiss Plaintiff's unjust enrichment claim is denied.

In their seventh point--entitled "Plaintiff's intentional interference with an advantageous relationship claim must fail"--Defendants argue that Plaintiff has failed to plead facts sufficient to make out a cause of action for intentional interference with an advantageous relationship. Defendants argue that to make out such a claim, Plaintiff must allege "(1) a business relationship between the plaintiff and third party exists (2) defendant's knowledge of the relationship and intentional interference with it (3) defendant acted with the <u>sole purpose</u> of harming the plaintiff or used dishonest, unfair or improper means, and (4) injury to the relationship." Defendants'

18

Memo at 14-15 (emphasis in original) (citing *Hutton v. Priddy's Auction Galleries, Inc.*, 275 F. Supp. 2d 428, 433 (S.D.N.Y. 2003). Although Plaintiff alleges business dealings consisting of his employment with Planet Aid and his working relationship with Planet Aid's managers, Plaintiff does not allege his participation in business dealings with any third parties. Thus, even construing Plaintiff's detailed 51-page amended complaint liberally, Plaintiff does not allege any facts to support this cause of action. Accordingly, Defendants' motion to dismiss Plaintiff's claim of intentional interference with an advantageous relationship is granted.

In their eighth point--entitled, "Plaintiff's retaliation and whistleblower claim must fail"-- Defendants argue that Plaintiff has not alleged any facts that would support a Title VII retaliation claim or a claim alleging the violation of New York's "whistleblower" statute, N.Y. Labor Law § 740. Defendants assert that the elements of a claim for Title VII retaliation are "(1) participation in a protected activity known to Defendant (2) employment action disadvantaging the person engaging in the protected activity [and] (3) [a] causal connection between protected activity and the adverse employment action." Defendants' Memo at 16 (citing *Maney v. Corning, Inc.*, 547 F. Supp. 2d 221, 231 (W.D.N.Y. 2007)). Defendants clarify that "protected activity typically refers to action taken to protest or oppose statutorily prohibited discrimination." *Id.*

A plaintiff can prove he engaged in a protected activity by "demonstrat[ing] a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (internal quotations omitted). Of course, a plaintiff need not formally oppose the allegedly discriminatory behavior, but may informally oppose it, for example, by complaining to management. *Hubbard v. Total Commc'ns, Inc.*, No. 08-5085-CV, 2009 WL 3154492, at * 1 (2d

Cir. 2009) (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

In this case, Plaintiff alleges the "protected activities" include his requests for various employee identification and supplies, his refusal to "submit to Carter's job offers," and his declaration to Carter that he would be truthful with Pederson regarding the operating condition of the $1,800 van. Amended Complaint at 4 and 45. With respect to the first of these, Plaintiff alleges that he requested employee identification because Carter would send Plaintiff to neighborhoods known for violence against African-Americans and that sending him to such neighborhoods without the benefit of identification was "racist." Amended Complaint at 4. However, Plaintiff alleges no facts to suggest his *requests* for identification were made for any reason other than his desire to utilize the identification in the execution of his duties. Plaintiff was not protesting employer conduct that he believed was in violation of Title VII.

Second, Plaintiff's refusal to accept other positions at Planet Aid was not protected activity because his refusal was not intended to oppose real or perceived Title VII violations. Plaintiff, in his written refusal of other positions at Planet Aid, *see* Amended Complaint Exhibit K, declined a truck driver and manager position because, as he makes clear throughout his amended complaint, he sincerely liked his bin maintenance position and wanted to remain in that position. He did not refuse to accept those positions to protest or oppose violations of Title VII.

Finally, Plaintiff alleges no evidence to suggest that his refusal to support Carter's scheme to defraud Pederson regarding the $1,800 van was designed to protest or oppose a violation of Title VII. Rather, Plaintiff makes clear, the purpose of his declaration was to inform Carter that he would not mislead Pederson if ever questioned by him. Amended Complaint at 34.

Defendants also argue that Plaintiff has not alleged facts suggesting a violation of New

20

York Labor Law § 740. Defendant's Memo at 16. Section 740 provides in relevant part, that an employer is prohibited from taking retaliatory personnel action against an employee who:

> [D]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud ... objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation.

N.Y. Labor Law § 740(2)(a) and (2)(c). Although Plaintiff alleges that he threatened to reveal Carter's scheme to defraud Planet Aid of $200, Plaintiff does not allege any facts to suggest that he was retaliated against because he disclosed or threatened to disclose "an activity, policy or practice ... which ... present[ed] a substantial and specific danger to the public health or safety." *See Remba v. Fed'n Employment & Guidance Serv.*, 545 N.Y.S.2d 140, 142 (N.Y. App. Div. 1989), affd, 76 N.Y.2d 801 (1990). Accordingly, Defendants' motion to dismiss Plaintiff's Title VII retaliation and "whistleblower statute" claims is granted.

In their ninth point--entitled, "Plaintiff's hostile, abusive, and harassing work environment claim must fail"--Defendants essentially argue that Plaintiff cannot allege hostile work environment because he was working largely outside the office. Specifically, Defendants state "[s]ince Plaintiff did most of his work outside the office, Defendants fail to understand how the work environment could have become so severe and pervasive as to rise to the level of an abusive environment." Defendants' Memo at 17.

Defendants' novel assertion that it is impossible for Plaintiff to be subject to a hostile work environment because he mostly worked outside the office environment is unsupported by the law. District courts within the Second Circuit have repeatedly allowed plaintiffs with

21

occupations that occur largely in a non-office environment to proceed with claims of hostile work environment. *See e.g.*, *Hudson v. Potter*, 497 F. Supp. 2d 491 (W.D.N.Y. 2007) (Summary judgment was premature for a claim of hostile work environment where plaintiff, a full time letter-carrier for the postal service, alleged African-American letter-carriers were assigned "heavier mail cuts" than other letter-carriers). Accordingly, Defendants' motion to dismiss is denied.

In their tenth point--entitled, "Plaintiff's emotional distress claims must fail"--Defendants assert that the facts alleged in the Amended Complaint do not make out a claim for either intentional or negligent infliction of emotional distress. Defendants principally argue that Plaintiff's allegations do not suggest the sort of "extreme and outrageous conduct" necessary to make out these claims. Defendants' Memo at 18. Defendants also suggest that Plaintiff cannot make out a claim for negligent infliction of emotional distress because he does not allege that Defendants' conduct endangered his physical safety. *Id.*

In order to state a cause of action for either intentional or negligent infliction of emotional distress, a plaintiff must allege that a defendant engaged in conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Hernandez v. Central Parking Sys.*, 879 N.Y.S.2d 461 (N.Y. App. Div. 2009) (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983)); *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999); *Blake v. Race*, 487 F. Supp. 2d 187, 219 (E.D.N.Y. 2007). Moreover, while "physical injury is no longer a necessary component of a cause of action to recover damages for the negligent infliction of emotional distress ... [t]he circumstances under which recovery may be had for purely emotional

22

harm are extremely limited and, thus, a cause of action seeking such recovery must generally be premised upon breach of a duty owed directly to plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety." *Blake*, 487 F. Supp. 2d at 219 (quoting *Lancellotti v. Howard*, 547 N.Y.S.2d 654, 655 (N.Y. App. Div. 1989)).

In setting forth his claims for intentional and negligent infliction of emotional distress, Plaintiff lists the specific conduct which serves as the basis for these claims. First, Plaintiff alleges that Defendants intentionally caused him "undue distress" by assigning him to enter communities known for their antipathy to African-Americans without first providing him with any form of identification. Amended Complaint at 17-18. Second, Plaintiff alleges that Defendants assigned him to remove personal items owned by families being evicted from their apartments "without the protection of another worker." *Id.* at 46. Plaintiff implies that this was physically dangerous, and states that he was emotionally "distressed that [he] had to do that job regardless of his own ethical and spiritual objections to the removal of the families' items without their consent." *Id.* Third, Plaintiff alleges that Carter mocked other employees' handwriting, "causing plaintiff to become worried about his own handwriting." *Id.* at 47. Fourth, Plaintiff claims that he was forced to move "literally tons of clothing" without "safety gear or training," and to store clothing in his van overnight, causing him to worry both about his health and "about his van being parked on the street at night." *Id.* at 46-47. Plaintiff alleges that he developed a "disfiguring rash" on his legs and back as a result of handling dirty clothing, and that he "suffer[ed] distress ... from [such] an unsightly skin condition." *Id.* at 49. Finally,

23

Plaintiff claims that his termination and the financial consequences caused him "undue stress," which resulted in "a stroke in the eye, an ulcer of the stomach, and weight loss from these ailments." *Id.* at 49.

These allegations do not make out the sort of "extreme and outrageous conduct" necessary to state a cause of action for intentional or negligent infliction of emotional distress. Indeed, most of the conduct alleged by Plaintiff pales in comparison to employer conduct which has been held *not* to be "extreme and outrageous." For example, the court in *Epifani v. Johnson* held that it was not extreme and outrageous for an employer of household employees to: (1) limit employees to the use of only one bathroom, accessed only by stepping over dog house-breaking pads soaked with urine, (2) forbid employees from speaking to one another, (3) forbid the use of telephones, even if employees needed to contact their children, (4) search an employee's personal belongings and handbag without consent, (5) force employees to wait in the kitchen or laundry room, in the dark, when household guests were present (6) require employees to remain standing all day, (7) forbid employees to wear shoes, (8) fail to provide a lunch break, (9) call employees in the middle of the night to ask "why there was no air in [the employer's] bicycle tires," (10) call an employee at 10:00 pm, demanding the employee walk her dog, and (11) demand (unsuccessfully) that the employee bring her two-year-old child with her to the employer's home and lock the child in the dog's cage while the dog was being walked. 882 N.Y.S.2d 234, 240-41 (N.Y. App. Div. 2009). In addition, the New York Court of Appeals has held that the wrongful discharge of an at-will employee, even if "abusive," does not qualify as "extreme and outrageous

conduct." *Murphy*, 461 N.Y.S.2d at 236 (noting that to hold otherwise could "subvert the traditional at-will contract rule by casting his cause of action in terms of [these] tort[s]").

Accordingly, this Court concludes that Plaintiff's allegations, even if construed liberally and assumed to be true, do not make out a cause of action for either intentional or negligent infliction of emotional distress. In light of this conclusion, this Court need not reach the issue of whether Plaintiff has adequately alleged a "breach of a duty owed directly to plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety." *See Blake*, 487 F. Supp. 2d at 219.

In their eleventh point, entitled "Plaintiff's defamation claim must fail," Defendants argue that Plaintiff's claim for defamation is time-barred. Defendants' Memo at 19. Defendants are correct in noting that one year is the appropriate statute of limitations for defamation. *N.Y.C.P.L.R. 215*; *see Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 439 (2d Cir. 2008) (discussing the accrual of claims for slander and libel under the CPLR). However, since Plaintiff commenced this action on July 8, 2008, only claims alleging defamatory statements made before July 8, 2007, would be time barred. Defendants have not demonstrated that any of the statements which Plaintiff alleges to be defamatory were made before July 8, 2007. Accordingly, Defendants' motion to dismiss Plaintiff's defamation claim is denied.

In their twelfth and final argument--entitled, "Plaintiff's fraud, misrepresentation, and fraudulent inducement claims must fail"--Defendants principally argue that the allegations in the Amended Complaint are insufficient to make out a claim for fraudulent inducement. Defendants

25

maintain that "[t]he only facts alleged surrounding fraud in Plaintiff's Amended Complaint are inducement to put his van on the road ... and the $200 "scheme" to defraud Pederson ...." Defendants' Memo at 20. Without setting forth the elements of a claim for fraudulent inducement,[2] Defendants allege that the job offer that induced Plaintiff to spend the $4000 on his van was not a "misrepresentation," and that Defendants did not intend to defraud him. With respect to the $200 scheme, Defendants assert that Plaintiff did not rely on Carter's misrepresentation concerning the purchase price of the van and that Pederson, not Plaintiff, was the only person who may have suffered damages as a result of the fraud.

While Defendants' arguments may be persuasive, these arguments appear to misconstrue the basis for Plaintiff's fraudulent inducement claim. In setting forth this cause of action, Plaintiff makes no mention whatsoever of the $200 scheme. Rather, Plaintiff implies Carter falsely assured him that he had a "long-term job" and that he would be employed as a bin maintainer, not a truck driver.[3] Amended Complaint at 49. Defendants' arguments do not

---

[2]"In New York, the elements of fraudulent inducement are (1) representation of a material fact; (2) falsity of that representation; (3) scienter; (4) reliance; and (5) damages." *Wecare Holdings, LLC v. Bedminster Int'l Ltd.*, No. 08-CV-6213, 2009 WL 604877, at *9 (W.D.N.Y. Mar. 9, 2009).

[3]Specifically, Plaintiff alleges that "[he] clearly expressed to defendant that he was in sincere need of a long-term job and would not and could not afford to borrow money 'to put his van on the road' if defendant was not sincere in his long-term job offer." Amended Complaint at 49. Plaintiff also alleges that when he interviewed for the job, Carter explained to him that the job duties involved bin maintenance, removing minor donation overflows from the bins and bringing them to the Brooklyn headquarters, disposing of garbage near the bins, communicating with property owners where the bins were located and maintaining daily logs regarding the status of the bins. Truck driving was not mentioned, and Plaintiff claims he would not have been interested, because Plaintiff, as a former trucker, "could have easily ... acquired a truck driver job

26

specifically address these allegations. Even if they did, Defendants arguments turn on the details of what Carter told Plaintiff and what Carter intended. These fact-specific arguments cannot be determined at this stage of the proceedings, but must await summary judgment.

Defendants also suggest that the Amended Complaint fails to articulate Plaintiff's fraud claims with the particularity required by Fed. R. Civ. P. 9(b). Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed. R. Civ. P. 9(b); *Swierkiewicz*, 534 U.S. at 513 n.3. However, Defendants state they "need not address the credibility of Plaintiff's fraud claims under the requirements of Rule 9(b) because he does not allege sufficient elements to state a cause of action." Defendants' Memo at 19. Since Defendants decline to apply the Rule 9(b) standard to the facts of this case, this Court declines to address this issue. Accordingly, Defendants' motion to dismiss Plaintiff's claim of fraud and misrepresentation is denied.

---

elsewhere ... " However, after Carter's explanation of the duties and Plaintiff began working, "[he] ... was not allowed to work at his original job, bin maintenance." *Id.* at 2, 11 and 49.

## *CONCLUSION*

For the reasons set forth above, Defendants' motion to dismiss Plaintiff's NYSHRL, intentional interference with an advantageous relationship, Title VII retaliation, N.Y. Labor Law § 740 "whistleblower statute," and intentional and negligent infliction of emotional distress claims is granted. Defendants' motion to dismiss is denied in all other respects.

SO ORDERED.

SANDRA L. TOWNES
United States District Judge

Dated: October 30 , 2009
     Brooklyn, NY